IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICHARD LEONARDI,
    Plaintiff,

v.                                        Case No. 12-CV-133

UNIVERSITY OF WISCONSIN-MILWAUKEE
POLICE DEPARTMENT, RANDALL
KWASINSKI, CHRISTOPHER SCHUSTER,
DETECTIVE BEAUDRY, YOLANDA
ROBERTSON and DEPARTMENT OF
COMMUNITY CORRECTIONS,
    Defendants.

---

DEFENDANTS' PROPOSED FINDINGS OF FACT

---

       The defendants, Randall Kwasinski, Christopher Schuster, Steven Beaudry and Yolanda Robertson, by their attorneys, Attorney General J.B. Van Hollen and Assistant Attorneys General Anthony Russomanno and John Sweeney, submit these proposed findings of fact in support of their Motion for Summary Judgment.

       1.      Plaintiff Richard Leonardi has brought the present lawsuit alleging that his residence was illegally searched on June 3, 2010, in violation of his Fourth Amendment rights. (Docket 1).

       2.      Leonardi's claims are premised on violations of his rights under the United States Constitution, meaning that 42 U.S.C. § 1983 is applicable. (Docket 9, p.1).

       3.      This Court has jurisdiction over the section 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

       4.      Leonardi has been allowed to proceed against four defendants for allegedly having illegally searched his residence on June 3, 2010. (Docket 9, p. 9).

5. On June 3, 2010, Leonardi was a student enrolled at the University of Wisconsin-Milwaukee. (Kwasinski Affidavit, p. 2, ¶ 9).

6. Leonardi lived in student housing at the Kenilworth Square Apartments, Room 545B. (Kwasinski Affidavit, p. 2, ¶ 9).

7. The search in question was of a portion of Leonardi's apartment. (Kwasinski Affidavit, p. 4, ¶ 24; Schuster Affidavit, p. 3, ¶ 9; Robertson Affidavit, p. 8, ¶¶ 42-46).

8. All four defendants were present. (Beaudry Affidavit, p. 2-3, ¶¶ 8-9).

9. One defendant is Yolanda Robertson, who at all relevant times was employed by the Wisconsin Department of Corrections (DOC), Division of Community Corrections, as a Probation and Parole Agent, in Milwaukee, Wisconsin. Agent Robertson has held this position since July 2007. (Robertson Affidavit, p. 1, ¶ 2).

10. At the relevant time, on June 3, 2010, Robertson was Leonardi's probation agent and was supervising his probation. (Robertson Affidavit, p. 2, ¶¶ 4-6).

11. Robertson had been Leonardi's probation agent since August 12, 2008. (Robertson Affidavit, p. 2, ¶ 6).

12. This supervision stemmed from a November 22, 2004 no contest plea and conviction on 5 counts in Dane County case number 04CF1520: Obtaining a Controlled Substance by Fraud, 2 counts of Felony Bail Jumping, and 2 counts of Possession of Narcotic Drugs. Leonardi was out on bail in Dane County case numbers 04CF303 (charged: 04/11/2004) and 04CF637 (charged: 03/23/2004) on the date of his arrest and dates of committing the offenses in case number 04CF1520. (Robertson Affidavit, p. 2, ¶¶ 6-7, Exhibit 102).

13. As part of her job duties as an agent, Robertson is responsible for the provision of services to protect the public by holding offenders accountable for their behavior; the preparation of

case plans for offenders; fostering law abiding behavior and positive participation of individual offenders in the community; the preparation of accurate and timely investigations, reports, and case records; community outreach activities, liaison activities and other special assignments, as required. (Robertson Affidavit, pp. 1-2, ¶ 3).

14. The remaining three defendants were, at all times relevant, employed as police officers with the University of Wisconsin-Milwaukee (UWM) Police Department: Randall Kwasinski, Steven Beaudry, and Christopher Schuster. (Kwasinski Affidavit, p. 1, ¶ 2; Beaudry Affidavit, p. 1, ¶¶ 2-3; Schuster Affidavit, p. 1, ¶ 2).

15. Leading up to June 3, 2010, Leonardi had been participating in drug treatment while on probation. (Robertson Affidavit, p. 3, ¶¶ 9, 13; p. 5, ¶ 22).

16. A more detailed account of Leonardi's drug treatment and testing, among other events from August 2008 through June 2010, is found in defendants' Exhibit 103, which has been filed under seal and is referenced in Agent Robertson's Affidavit. (Robertson Affidavit, p. 2-3, ¶ 8, Exhibit 103).

17. In May 2009, Agent Robertson received telephone calls from Leonardi's girlfriend and his sister to the effect that Leonardi was using drugs. (Robertson Affidavit, p. 3, ¶ 11; Exhibit 103, pp. 6-7).

18. The calls also indicated that Leonardi was being physically abusive to the girlfriend, left their child unattended while he was passed out, was stealing money, and was threatening to harm them. (Robertson Affidavit, p. 3, ¶ 11; Exhibit 103, pp. 6-7).

19. On May 8, 2009, Leonardi was arrested at the home he shared with his girlfriend because he was high, drunk and refused to leave. (Robertson Affidavit, p. 3, ¶ 12; Exhibit 103, p. 7).

20. On May 15, 2009, Leonardi signed an Alternative to Revocation (ATR) which included mandatory Domestic Violence counseling and drug treatment. (Robertson Affidavit, p. 3, ¶ 13; Exhibit 103, p. 7; Exhibit 104, pp. 6-7).

21. As of January 2010, Leonardi was being supervised at the High Risk Level which required weekly office visits. (Robertson Affidavit, p. 4, ¶ 14).

22. On February 1, 2010, Agent Robertson received correspondence from the Milwaukee County District Attorney's Office, Domestic Violence Liaison, indicating that Leonardi was the subject of a dispute and was issued a Temporary Restraining Order. (Robertson Affidavit, p. 4, ¶ 15).

23. The complainant indicated that Leonardi threatened a man with physical violence and was harassing him. (Robertson Affidavit, p. 4, ¶ 15).

24. On February 10, 2010, Agent Robertson issued a warrant for Leonardi's arrest based on the assaultive allegations. (Robertson Affidavit, p. 4, ¶ 16).

25. On March 16, 2010, Agent Robertson received a telephone call from an officer from UWM police stating that Leonardi was arrested for stealing between 10-15 chemistry books from UWM book store and reselling them back to an off campus store for cash between February 1, 2010 and March 16, 2010. (Robertson Affidavit, p. 4, ¶ 17; Exhibit 103, p. 12).

26. Leonardi had not made contact with Agent Robertson, as required, for the four to five weeks preceding his arrest on March 16, 2010. (Robertson Affidavit, p. 4, ¶ 18).

27. On or about March 22, 2010, Leonardi was released from lock up and reported to Agent Robertson. (Robertson Affidavit, p. 4, ¶ 19; Exhibit 103, p. 12).

28. Leonardi was provided an Alternative to Revocation (ATR) and Rules of Community Supervision, as a result of his March 2010 arrest. (Robertson Affidavit, p. 4-5, ¶ 20; Exhibit 104, pp. 1-5).

29. That meant that Leonardi's probation was not revoked, but that he agreed to certain conditions. (Robertson Affidavit, p. 4-5, ¶ 20; Exhibit 104, pp. 1-5).

30. The provisions in the March 23, 2010, Rules of Community Supervision were already in place prior to March 23, 2010, as Leonardi had previously agreed to Rules of Community Supervision as part of his probation. (Robertson Affidavit, p. 5, ¶ 21; Exhibit 104, pp. 1-5).

31. However, the March 23, 2010, version was the most recent signed copy, and was the version in effect at the time of the June 3, 2010 incident. (Robertson Affidavit, p. 5, ¶ 21; Exhibit 104, pp. 1-5).

32. The March 23, 2010, ATR added intensive drug treatment with documented attendance as well as weekly office appointments. (Robertson Affidavit, p. 5, ¶ 22).

33. A new home visit was scheduled for March 26, 2010. (Robertson Affidavit, p. 5, ¶ 23).

34. On March 25, 2010, events detailed in her chronological log made Agent Robertson suspicious that Leonardi could be using heroin. (Robertson Affidavit, p. 5, ¶ 24; Exhibit 103, p. 13).

35. Leonardi was told that he must obtain required treatments or Agent Robertson would refer him to Department of Correction (DOC) Purchase of Service (POS) Provider. A POS is an agency in contract with DOC to provide services such as AODA (alcohol and drug abuse) treatment, assessments, counseling and so on. (Robertson Affidavit, p. 5, ¶ 24; Exhibit 103, p. 13).

36. Having not heard from Leonardi to schedule his weekly appointment, on May 4, 2010, Agent Robertson attempted to call him but received no answer or call back. (Robertson Affidavit, p. 5, ¶ 25).

37. Given Leonardi's behavior, Agent Robertson was beginning to assume that he was intending not to report regularly, as required, and was avoiding contact with her. (Robertson Affidavit, p. 5, ¶ 26).

38. Leonardi's sporadic reporting was consistent with his past behaviors when he was on drugs. (Robertson Affidavit, p. 5, ¶ 26).

39. In line with common supervising practices, Agent Robertson mailed an appointment card on June 2, 2010, to Leonardi with an appointment scheduled for June 10, 2010, at 2:00 p.m., or a warrant would be issued. (Robertson Affidavit, p. 5-6, ¶ 27).

40. On or before June 3, 2010, Agent Robertson received a phone call from UWM Police stating that Leonardi was caught on tape stealing a woman's bag in the UWM computer lab. (Robertson Affidavit, p. 6, ¶ 28; Exhibit 103, p. 15).

41. The officer who called Robertson was Officer Kwasinski. (Kwasinski Affidavit, p. 3, ¶¶ 10, 12).

42. Agent Robertson informed Officer Kwasinski that she was looking for Leonardi as well and would enter a warrant for his arrest for a parole violation. (Kwasinski Affidavit, p.3, ¶ 12).

43. Agent Robertson also informed Officer Kwasinski that Leonardi resided at the UWM Kenilworth Square Apartments and told him that she wanted to do a home visit and that he could meet her there. (Kwasinski Affidavit, p. 3, ¶ 12).

44. When Agent Robertson was alerted that Leonardi was suspected of stealing a bag at the UWM computer lab, she knew that this behavior was typical of Leonardi when he was or had been using drugs, as it was consistent with his behavior when trying to support his drug habit. (Robertson Affidavit, p. 6, ¶ 29).

45. Also, on June 3, 2010, Agent Robertson received a telephone call from the apartment manager at Leonardi's apartment, and was told that there were problems at his apartment. (Robertson Affidavit, p. 6, ¶ 30; Exhibit 103, p. 15).

46. Agent Robertson was told that Leonardi had allowed another student to move into his apartment, who had been kicked out of school for using illegal drugs. (Robertson Affidavit, p. 6, ¶ 30; Exhibit 103, p. 15).

47. The roommate's father was then placed on the phone. The father of the roommate complained that the plaintiff was holding his son's belongings and refused to turn them over. (Robertson Affidavit, p. 6, ¶ 30; Exhibit 103, p. 15).

48. As a result of receiving these calls, Agent Robertson decided to go to the dorm to assist the apartment manager and to establish contact with Leonardi. (Robertson Affidavit, p. 6, ¶ 31).

49. Agent Robertson and the police officers arranged to meet at the apartment. (Robertson Affidavit, p. 6, ¶ 31; Schuster Affidavit, p. 2, ¶ 5; Kwasinski Affidavit, p. 3, ¶ 12).

50. Also on June 3, 2010, Agent Robertson issued a warrant for Leonardi's arrest. (Robertson Affidavit, p. 6, ¶ 32; Exhibit 105).

51. Agent Robertson had multiple purposes for going to Leonardi's apartment, including to assist the apartment manager and to reestablish contact with Leonardi, and to inquire

into his recent behavior, including her concerns about Leonardi's illegal drug use and Leonardi having been accused of stealing a bag. (Robertson Affidavit, p. 7, ¶ 34).

52. Robertson's summary in the Chronological Log for that event states: "AOR went to the apartment at the request of the apartment manager to assist the police with gaining entry as well as to conduct a home visit and attempt to help the father of the roommate obtain his son's personal property." (Robertson Aff. ¶ 16; Exhibit 103 at 15).

53. Agent Robertson believed that Leonardi had or was relapsing on drugs and may have stolen the bag. (Robertson Affidavit, p. 7, ¶ 35).

54. Agent Robertson's belief about the bag was based on the information from the police about there being video evidence, among other evidence, that Leonardi stole the bag. (Robertson Affidavit, p. 7, ¶ 35).

55. Agent Robertson also believed Leonardi was using drugs because his stealing behavior was linked in the past to drug use. (Robertson Affidavit, p. 7, ¶ 35).

56. Robertson also believed Leonardi was using drugs based on her contacts with Leonardi's family members, and he had not been making the required contacts with her, which was indicative of Leonardi being on drugs. (Robertson Affidavit, p. 7, ¶ 35).

57. The police defendants—Kwasinski, Schuster, and Beaudry—met Robertson outside of the apartment. (Schuster Affidavit, p.2, ¶ 5; Beaudry Affidavit, p. 3, ¶ 9; Kwasinksi Affidavit, p. 3, ¶ 11; Robertson Affidavit, p. 7, ¶ 36).

58. Officer Kwasinski and Officer Schuster both worked as police officers under the general supervision of the Police Sergeant. (Kwasinski Affidavit, p. 1-2, ¶ 3; Schuster Affidavit, pp. 1-2, ¶ 3).

59. Detective Beaudry, among other duties as a police detective, investigated computer and internet crime, managed campus access control and surveillance systems, and collected and maintained electronic evidence. (Beaudry Affidavit, p. 1-2, ¶ 4).

60. Officer Kwasinski had requested Officer Schuster's assistance at Leonardi's residence. (Schuster Affidavit, p. 2, ¶ 5).

61. Detective Beaudry was also present in a backup capacity. (Beaudry Affidavit, p. 3, ¶ 10).

62. Officer Kwasinski also was involved in a previous investigation into the theft of books at the bookstore involving Leonardi in March 2010. (Kwasinski Affidavit, p. 2, ¶ 8).

63. Officer Kwasinski was aware of Leonardi's history of using illegal drugs. Officer Kwasinski knew that because, when investigating the previous March 2010 incident regarding Leonardi stealing books from the bookstore, he ran his name through the system and saw that he was on probation for drug related offenses. (Kwasinski Affidavit, p. 3, ¶ 11).

64. Prior to arriving at Leonardi's residence, Beaudry had assisted Officer Kwasinski in reviewing video footage pertaining to the bag theft by downloading and burning digital evidence to discs. (Beaudry Affidavit, p. 2, ¶ 6; Exhibit 106).

65. A portion of that footage, which shows Leonardi in the computer lab prior to the bag being stolen, is attached to Beaudry's Affidavit as Exhibit 106. (Beaudry Affidavit, p. 2, ¶ 6; Exhibit 106).

66. Other additional footage, which the department is no longer able to locate, showed Leonardi putting the stolen bag inside his bag before he leaves the computer lab. Detective Beaudry viewed that additional footage and saw those events. (Beaudry Affidavit, p. 2, ¶ 6).

67. Officer Kwasinski also saw the video footage showing Leonardi stealing the bag. (Kwasinski Affidavit, p. 2, ¶ 7; Exhibit 100, p. 6, 25; Beaudry Affidavit, p. 2, ¶ 6).

68. Detective Beaudry also obtained the computer identifier numbers from a computer that a video showed was being used by the person who stole the bag in question. These numbers were forwarded to the IT security personnel for identity. Detective Beaudry received information via email from IT stating that the computer identifier belonged to Richard Leonardi. (Beaudry Affidavit, pg. 2, ¶ 7; Kwasinski Affidavit, p. 2, ¶ 5; Exhibit 100 at 3-4).

69. When Agent Robertson arrived at Leonardi's apartment, the police officers were already there, but were outside the apartment and had not entered it. (Robertson Affidavit, p. 7, ¶ 36; Beaudry Affidavit, p. 3, ¶ 9).

70. A University Housing staff member was also present outside of Leonardi's apartment. (Kwasinski Affidavit, p. 3, ¶ 13; Beaudry Affidavit, pp. 2-3, ¶ 8-9).

71. As part of Leonardi's Rules of Community Supervision, Leonardi was required to make himself available for searches or tests ordered by his agent, including but not limited to urinalysis, breathalyzer, DNA collection and blood samples or a search of his residence or any property under his control. (Robertson Affidavit, p. 5, ¶21; p. 6-7, ¶ 33; Exhibit 104, p. 3, #6).

72. Agent Robertson then knocked on the door to Leonardi's apartment. (Robertson Affidavit, p. 7, ¶ 37).

73. Robertson said, "Richard this is Yolanda, open up," or words to that affect. (Robertson Affidavit, p. 7, ¶ 37).

74. Agent Robertson knocked on the door several times. (Kwasinski Affidavit, p. 3, ¶ 14; Schuster Affidavit, p. 2, ¶ 6).

75. While waiting, Officers Kwasinski and Schuster could hear movement within Leonardi's room and a toilet flush. (Kwasinski Affidavit, p. 3, ¶ 14; Schuster Affidavit, p. 2, ¶ 6).

76. After several minutes, Leonardi answered the door and allowed Agent Robertson and the police officers to come inside. (Robertson Affidavit, p. 7, ¶ 38; Kwasinski Affidavit, p. 3, ¶ 14; Schuster Affidavit, p. 2, ¶ 6; Docket 1, p. 3, ¶ 16).

77. On answering the door, Leonardi did not state he did not want them to come in, and he left room for Agent Robertson and the officers to enter. (Robertson Affidavit, p. 7, ¶ 38; Kwasinski Affidavit, p. 3, ¶¶ 14-15).

78. Leonardi did not attempt to hinder their entry, either physically or verbally. (Robertson Affidavit, p. 7, ¶ 38; Kwasinski Affidavit, p. 3, ¶¶ 14-15).

79. Robertson was the first to enter the apartment, followed by Officer Kwasinski, Detective Beaudry and then Officer Schuster. (Schuster Affidavit, p. 2, ¶ 6; Robertson Affidavit, p. 7, ¶ 39).

80. Officer Kwasinski placed handcuffs on Leonardi and sat him down on a futon in a small living area. (Robertson Affidavit, p. 7, ¶ 40, Kwasinski Affidavit, p. 3, ¶ 16; Schuster Affidavit, p. 2, ¶ 7; Beaudry Affidavit, p. 3, ¶ 11).

81. The dorm apartment was small and compact. (Robertson Affidavit, p. 8, ¶ 41).

82. After entering the apartment, Leonardi, Agent Robertson, and the officers were in a small, open, studio-style living area with a kitchen and futon ("futon area"). (Robertson Affidavit, p. 8, ¶ 41).

83. Leonardi was directed to the futon. The futon was situated very close to Leonardi's bedroom door, which was open. (Robertson Affidavit, p. 8, ¶ 41).

84. Specifically, from where Leonardi was sitting, you could have entered his bedroom by turning and taking one step. (Robertson Affidavit, p. 8, ¶ 41).

85. Because the door was open, the inside of Leonardi's bedroom was clearly visible from the futon area. (Robertson Affidavit, p. 8, ¶ 41; Kwasinski Affidavit, pp. 3-4, ¶ 19; Exhibit 101).

86. More specifically, Leonardi was situated on the end of a futon directly around a corner from Leonardi's open bedroom door. His location during these events is represented by an "X" on a diagram attached as Exhibit 101, and the entry to his bedroom is circled on that diagram. (Kwasinski Affidavit, pp. 3-4, ¶ 19; Exhibit 101).

87. The police officers did not at that time search the apartment but rather stayed with Leonardi. (Robertson Affidavit, p. 7, ¶ 40; Schuster Affidavit, p. 2, ¶ 7; Beaudry Affidavit, p. 3, ¶ 11; Docket 1, p. 3-4, ¶¶ 16-18).

88. From the futon area, Agent Robertson could see a bag in Leonardi's bedroom matching the description of the bag Leonardi was suspected to have stolen. (Robertson Affidavit, p. 8, ¶ 42).

89. Agent Robertson knew that the bag matched the description because the police had informed her that the stolen bag was a laptop bag with a handmade yarn keychain attached to the outside. The bag Agent Robertson saw in Leonardi's bedroom matched that description. (Robertson Affidavit, p. 8, ¶ 42).

90. Agent Robertson moved towards the bag because it matched the description of the bag that was stolen from the UWM computer lab. (Robertson Affidavit, p. 8, ¶ 43).

91. Agent Robertson saw a second black bag next to the stolen bag as she entered Leonardi's bedroom. (Robertson Affidavit, p. 8, ¶ 44).

92. Because the bedroom and the futon area were so close together, Agent Robertson's actions in the bedroom were visible from the futon area where the officers remained with Leonardi. (Robertson Affidavit, p. 8, ¶ 44).

93. The second black bag was laying open enough for Agent Robertson to see what she believed to be drug paraphernalia. Specifically, Agent Robertson saw a needle and a spoon in the bag. (Robertson Affidavit, p. 8, ¶ 45).

94. From Agent Robertson's training and experience, she knew a needle and spoon were often used to administer heroin. Knowing that Leonardi had a history of heroin use, and that Agent Robertson suspected Leonardi was currently using, she concluded that the needle and spoon had been used by Leonardi to take heroin. (Robertson Affidavit, p. 8, ¶ 45).

95. Agent Robertson picked up the black bag, after seeing the drugs and paraphernalia in the pocket. Agent Robertson turned around with the bag so that it faced Leonardi as well as the officers, and so that the contents were visible to all of them. (Robertson Affidavit, p. 9, ¶ 46).

96. Agent Robertson did not enter the bedroom or investigate the contents of these bags at the request of the police officers, but rather did these actions based on what she saw upon entering the apartment, together with the knowledge she had about Leonardi being suspected of stealing the bag and about her suspicions that Leonardi had been using illegal drugs. (Robertson Affidavit, p. 9, ¶ 47).

97. Agent Robertson turned these items over to Officer Kwasinski. (Kwasinski Affidavit, p. 4, ¶ 20).

98. Based on Officer Kwasinski and Officer Schuster's experience and training, which includes training on the appearance of illegal drugs, they believed that the whitish-brown spoon residue was an illegal drug, which was consistent with the hypodermic needle, which is

typically used to administer illegal drugs with a spoon. (Kwasinski Affidavit, p. 4, ¶ 21; Schuster Affidavit, p. 2-3, ¶ 8).

99. Kwasinski was aware of what the stolen bag looked like because he had viewed camera footage of the theft and also spoke to the owner of the book bag. (Kwasinski Affidavit, p. 2, ¶ 7; Beaudry Affidavit, p. 2, ¶ 6).

100. Given the syringe, spoon, stolen bag, and the warrant in the system, Officer Kwasinski believed they had probable cause to arrest Leonardi. (Kwasinski Affidavit, p. 4, ¶ 22).

101. Officer Kwasinski then told Leonardi he was in custody and proceeded to read Leonardi his Miranda Warnings. (Kwasinski Affidavit, p. 4, ¶ 23).

102. This occurred in the futon area of the apartment. (Kwasinski Affidavit, p. 4, ¶ 23).

103. Once the officer placed Leonardi under arrest, Agent Robertson ceased her search and began speaking to Leonardi in the futon area. (Robertson Affidavit, p. 9, ¶ 48).

104. Agent Robertson did not participate in the officers' subsequent search. (Robertson Affidavit, p. 9, ¶ 48).

105. At some point during these events, Leonardi was moved from the futon to a chair next to the futon, as he complained he was uncomfortable on the futon. (Schuster Affidavit, p. 3, ¶ 10).

106. Officer Kwasinski then began a search of Leonardi's room while Agent Robertson spoke to Leonardi in the futon area. (Kwasinski Affidavit, pp. 4-5, ¶ 24).

107. Officer Schuster participated in the search by checking the bed area, part of the closet and part of the desk area. (Schuster Affidavit, p. 3, ¶ 9).

108. Detective Beaudry did not assist in the search. (Beaudry Affidavit, p. 3, ¶ 10).

109. Detective Beaudry did not have any supervisory authority to ensure that UWM Police Officers followed certain policies or procedures when searching. (Beaudry Affidavit, p. 3, ¶ 13).

110. Leonardi's room had several burn marks on the floor and on his desk. The trash bin had several spent cigarettes and empty corner cut pieces of plastic baggies. (Kwasinski Affidavit, pp. 4-5, ¶ 24).

111. Officer Kwasinski located a small corner cut baggie that contained a white powdery substance inside a jewelry holder that was on Leonardi's desk. (Kwasinski Affidavit, pp. 4-5, ¶ 24).

112. This search took place within a short distance from the area where Leonardi was located, as Leonardi's bedroom was only steps away. (Kwasinski Affidavit, pp. 4-5, ¶ 24).

113. The bedroom itself was compact, with room for a small bed and a small desk. (Kwasinski Affidavit, pp. 4-5, ¶ 24).

114. Through Officer Kwasinski's training and experience, he believed the powdery substance to be heroin or an opium derivative. (Kwasinski Affidavit, pp. 5, ¶ 25).

115. Officer Kwasinski also saw the black laptop style single strap bag in Leonardi's room that he believed was the stolen bag based on its appearance and a distinctive piece of knit cloth attached to it. (Kwasinski Affidavit, p. 5, ¶ 25).

116. The substances found on the spoon and in the baggie in Leonardi's bedroom subsequently tested positive as heroin. (Kwasinski Affidavit, p. 5, ¶ 26; Exhibit 100, pp. 5, 7, 45; Schuster Affidavit, p. 3, ¶ 11).

117. Leonardi's probation was subsequently revoked and he was confined to prison. (Docket 1, p. 5, ¶ 28).

118. All decisions Officer Kwasinski, Officer Schuster and Detective Beaudry made were in accordance with what they understood to be the law, and policies and procedures of the University of Wisconsin Police Department. (Kwasinski Affidavit, p. 5, ¶ 28; Schuster Affidavit, p. 3, ¶ 12; Beaudry Affidavit, p. 3, ¶ 14).

119. All decisions Agent Robertson made were in accordance with what she understood to be the law, and policies and procedures of the Department of Corrections, Probation and Parole. (Robertson Affidavit, p. 9, ¶ 50).

Dated this 15th day of February, 2013.

J.B. VAN HOLLEN
Attorney General

**s/ Anthony D. Russomanno**
ANTHONY D RUSSOMANNO
Assistant Attorney General
State Bar #1076050

JOHN R. SWEENEY
Assistant Attorney General
State Bar #1003066
Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2238 (Russomanno)
(608) 264-9457 (Sweeney)
(608) 267-8906 (Fax)
russomannoad@doj.state.wi.us
sweeneyjr@doj.state.wi.us